UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JONATHAN ZUZGA,

                Plaintiff,                          Case No. 19-11454

v.                                          Honorable Thomas L. Ludington

MICHIGAN SUGAR, et al.,

                Defendants.

_____/

**ORDER DENYING DEFENDATS' MOTION FOR SUMMARY JUDGMENT AND
DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jonathan Zuzga worked for Defendant Michigan Sugar for more than 14 years, beginning as a welder and advancing to Director of Maintenance and Agricultural Technologies. After a dispute regarding the assignment of a new piler system Plaintiff invented, Plaintiff was terminated. On April 3, 2019, he filed a complaint in Bay Count Circuit Court against Defendants, Michigan Sugar Company and James Ruhlman. Plaintiff alleged Defendants violated the Michigan whistleblowers' protection act because they retaliated against him for reporting Defendant's false filing of a patent.  ECF No. 1-2 at PageID.14-20. He also alleges Defendants unlawfully asserted ownership of his piler (conversion) and committed tortious interference in Plaintiff's relationship with engineering firms and in Plaintiff's relationship with Michigan Sugar employees. The case was removed on May 17, 2019. ECF No. 1. An amended complaint, adding one count alleging business defamation (Defendants misrepresented that Plaintiff had assigned his rights to the piler to the US Patent Office) and one count seeking a declaratory judgment that Plaintiff is the rightful owner of the patent, was filed on June 6, 2019. ECF No. 8. When Defendants answered the complaint, they counterclaimed, alleging copyright infringement and Michigan and federal trade

secret misappropriation based upon Plaintiff's alleged retention of copies of Krech engineering firm's drawings of the piler, and breach of fiduciary duty based on Plaintiff asking Michigan Sugar employees to sign a non-disclosure agreement. Defendants also seek a declaratory judgment that Michigan Sugar "is the rightful and sole owner of all inventions conceived by Zuzga during his employment at Michigan Sugar related to improvements in piler machinery." ECF No. 3.

Defendants filed a motion for summary judgment on May 11, 2020 seeking dismissal of Plaintiff's five counts and asking the Court to grant its counterclaims for Michigan Trade Secret Misappropriation, breach of fiduciary duty, and declaratory judgment. ECF No. 20. Plaintiff filed a cross-motion for summary judgment the same day seeking dismissal of Defendants' five counterclaims and asking the Court to grant his claims for conversion, business defamation, and declaratory judgment. ECF No. 21. Responses and replies were timely filed. ECF Nos. 24, 25, 26, 27.

## I.

### A.

This case revolves around a former employee of Michigan Sugar, Jonathan Zuzga, and his design of a new beet piler machine. It is uncontested that Zuzga was the inventor of the new piler concept. The question is whether Zuzga assigned his rights to the piler machine to Michigan Sugar. *See* ECF No. 20-3 at PageID.685-686. The piler exists only on paper. A prototype of the new piler has not been built. ECF No. 20-2 at PageID.513.

For the final years of Zuzga's employment at Michigan Sugar, his supervisor was Jim Ruhlman, the executive vice president. ECF No. 20-3 at PageID.801; ECF No. 20-10 at PageID.891. The President and Chief Executive Officer of Michigan Sugar is Mark Flegenheimer. ECF No. 20-26 at PageID.1424.

Michigan Sugar Company is headquartered in Bay City, Michigan. *Michigan Sugar*, www.michigansugar.com (last visited July 22, 2020). There are almost 900 grower-operators in Michigan and Ontario, Canada. *Id.* "The sugar is sold to industrial, commercial and retail customers under the Pioneer and Big Chief brands." *Id.* A sugar beet piling machine "removes the beets from a truck and places them into a pile" for long-term storage. ECF No. 20-2 at PageID.364. The general components of a beet piler include a cross conveyor, incline conveyor, dirt cleaning screen, a boom, and a tare-tacking system. ECF No. 20-2 at PageID.365. When farmers drive to a Michigan Sugar location to deliver their beets, a tare sample is taken. A tare sample is a sample of the beets and dirt in the truck and the percentage of sugar beets versus dirt is extrapolated for the entire load. ECF No. 20-2 at PageID.366.

**B.**

Plaintiff Jonathan Zuzga is not a farmer, nor has he grown sugar beets. ECF No. 20-2 at PageID.364. He worked at Michigan Sugar from July 2004 to February 8, 2019. ECF No. 20-2 at PageID.380. Zuzga has held seven jobs during his tenure with Michigan Sugar. He began as a welder where he installed pipes and repaired tanks. ECF No. 20-2 at PageID.382-383. His second job, for two years, was as a part loader operator and part welder. ECF No. 20-2 at PageID.384-385. His third job, from August 2006 to May 2009, was as a line leader. ECF No. 20-2 at PageID.385. As line leader, his job responsibilities included "equipment maintenance, production demands, [moving] the product to and from the silo, [t]ruck loading, . . . [and] product storing." ECF No. 20-2 at PageID.385-386. He oversaw some equipment maintenance as well, which included preventative maintenance such as "greasing, lubing, and oiling necessary equipment." ECF No. 20-2 at PageID.387.

His fourth job was assistant warehouse manager/head of maintenance. He held the position from 2009 to 2012. ECF No. 20-2 at PageID.387. It was his first salaried position. ECF No. 20-2 at PageID.387-388. He supervised employees on the line. ECF No. 20-2 at PageID.388. He was not responsible for the beet pilers, but rather focused on the warehouse and packaging. ECF No. 20-2 at PageID.388. Specifically, his maintenance responsibilities were for "conveyors, screw conveyors, dust collectors, robotic palletizers, baling system . . . [s]rhink wrap, heat shrink tunnel" and all components in a silo. ECF No. 20-2 at PageID.388. All improvements to the machinery were the result of using the equipment more effectively and better training employees. ECF No. 20-2 at PageID.389-390. Employees supervised by Zuzga also focused on preventative maintenance. ECF No. 20-2 at PageID.390. Any equipment enhancements were handled by engineers and Zuzga did not approve or make any of those changes himself. ECF No. 20-2 at PageID.390.

Zuzga's fifth job was packaging and warehousing maintenance manager. ECF No. 20-2 at PageID.391. Any improvements he made to technology during this time period involved fixing the equipment so it would work properly. ECF No. 20-2 at PageID.389-392 ("I would study the equipment and how it was meant to run, and I would put in changes that were within the industry that you could buy off the shelf that it was just implemented improper. . . . I didn't design anything or create anything.").

Zuzga's sixth job was agricultural maintenance/beet receiving operations manager from October 2015 – October 2018. ECF No. 20-2 at PageID.399-400. He was responsible for all equipment within the agricultural department of Michigan Sugar, including "skid-skeets, sky tracks, payloaders, fleet trucks, pilers, [and] ventilation systems." ECF No. 20-2 at PageID.403. He testified that his job responsibilities included "maintenance on the piling grounds for beet

storage equipment, grounds storage, grounds facilities, [and] people management. . . . [He] was responsible for identifying capital opportunities, [ ] implementing and developing processes and new process changes." ECF No. 20-2 at PageID.401-402. Part of his job included improving the beat pilers, such as adjusting the sensors. ECF No. 20-2 at PageID.402. He would collaborate with electricians and technicians throughout the process. ECF No. 20-2 at PageID.402-403. Ruhlman testified that Zuzga was not expected to do "the traditional tasks of an engineer," but he was expected to "[c]om[e] up with ideas and concepts and collaborating and putting things together." ECF No. 20-10 at PageID.927.

One of the responsibilities spelled out in the job description for the agricultural maintenance manager, is "[o]versee the design and engineering for new capital projects. This includes collaboration with engineering firms and contractors." ECF No. Part 20-9 at PageID.883. Ruhlman testified that he does not know if Zuzga was provided a copy of the agricultural maintenance manager job description. ECF No. 20-10 at PageID.925-926. Zuzga provided an affidavit explaining that he never saw the job description prior to the lawsuit. ECF No. 24-2 at PageID.2491. However, he also averred in the same document, "If there was a new project involving new equipment, as the Maintenance Manager I was responsible to oversee the design and engineering of the those projects, but that did not involve me designing or engineering the new equipment myself." ECF No. 24-2 at PageID.2491.

Finally, from October 2018 until his termination in February 2019, Zuzga was director of maintenance and agricultural technologies. Part of the job description included "[e]valuating and implementing storage techniques and technologies to preserve beet quality," "[e]valuating and determining the most effective and careful piling methods [for] beet receiving," "[e]xpertise in machinery related to PLCs, variable speed drives, RF technologies, conveyors, cleaning bed

systems and automating and integrating [of] said technologies," and "[a]bility to evaluate and demonstrate the value of new technologies associated with automation, workforce reduction, and improved raw material storage effectiveness." ECF No. 21-3 at PageID.2096; ECF No. 20-2 at PageID.409. It was a newly created position when Zuzga became director. ECF No. 20-10 at PageID.899-900. The job description did not include language regarding capital projects that was a part of the sixth job, but Ruhlman testified that "it was assumed that the duties that were in the other position were also assumed in this one." ECF No. 20-10 at PageID.909.

Zuzga was evaluated annually throughout his time at Michigan Sugar. A 2011 evaluation stated that "John has made several improvement and upgrades to existing equipment in warehouse, which has allowed us to dramatically improve uptime and reliability of equipment" regarding a scale software change. ECF No. 20-3 at PageID.745-746. Zuzga testified that for someone who does not understand how the system works, "it would appear to be an upgrade or an advancement. [However,] [i]t was literally just making [the equipment] work the way it was intended to work." ECF No. 20-3 at PageID.746. His 2012 evaluation stated Zuzga made "many noticeable improvements in the folder/gluers throughout the packing room" and his performance goals included "Jon needs to continue on making improvements on the bagging machines, folder gluers, [TEKKRA's] and conveyor systems."  ECF No. 20-3 at PageID.747-749. Zuzga explained that the changes to the packing room were recommendations from the manufacturer and the improvements were "greasing and proper maintenance." ECF No. 20-3 at PageID.749-750. In 2014, Zuzga's evaluation explained that he "played a bi[g] role in helping implement the RFID" system and improved the "industrial brown process." ECF No. 20-3 at PageID.753-754. One of his performance goals for the same year was to "work towards fully automating the sugar delivery system in packing room to reduce the dependency of a person in the control room." ECF No. 20-

3 at PageID.755. Zuzga explained that the automation included all the controls into one programming logics control ("PLC") so the "technicians could fine tune some [of] its function." ECF No. 20-3 at PageID.755. In 2017, one of Zuzga's listed accomplishments was "[n]ew concept piler design." ECF No. 20-3 at PageID.757-758; ECF No. 21-4. The comments on his interpersonal skills state his interpersonal skills are "very good" and the comments on his self-management skills provide, "The amount of change that Jon has implemented this past year is nothing short of amazing. Restructuring the pillar [sic] that he is part of, has taken much thought patience and diligence." ECF No. 21-4.  In September 2018, Zuzga received a 7% salary increase. ECF No. 20-26 at PageID.1433-1434.

There have been several times throughout his employment that Zuzga modified existing equipment. In March 2016, Zuzga emailed his supervisor to discuss a modified version of a Turkish company's tare probing and receiving equipment idea that ultimately was not adopted. ECF No. 12-2 at PageID.414-417. He also relocated technology and added new equipment to change the system of weighing the beets. ECF No. 20-2 at PageID.422-423. He had an idea to place samples of beets for taring in plastic totes. ECF No. 20-2 at PageID.423-424. Additionally, he worked on changing lighting indicators and automating some functions of the Kringstad piler to check sensors, changing conveyors to reduce damage to beets, changing the hydraulic gates to reduce spillage of beets, and worked on RFID tracking for the beets. ECF No. 20-2 at PageID.424-463. Some of the changes required the purchase of equipment "off-the-shelf" and then reconfiguring it when it arrived at Michigan Sugar. ECF No. 20-2 at PageID.438. Any unique programming software changes were handled by Paul Bach. ECF No. 20-2 at PageID.438.

**C.**

Besides the beet piler patent at issue in this case, the record shows one other time Zuzga discussed patents with his supervisor was during RFID antenna development. Zuzga "worked with a contractor to build a custom cart for it that had an electric supply." ECF No. 20-2 at PageID.462-463. The equipment was new to Michigan Sugar and Zuzga worked on the project during the workday. ECF No. 20-2 at PageID.464. Ruhlman gave Zuzga permission to file a provisional patent on the project. Zuzga testified that Ruhlman told him that "[Michigan Sugar is] not in the business of equipment design." ECF No. 20-2 at PageID.464-465; ECF No. 20-10 at PageID.903-906. Zuzga never finished the patent process due to lack of funds. ECF No. 20-2 at PageID.464-465.

**D.**

In 2016 and 2017 Zuzga was directed to purchase a new and better piler system for Michigan Sugar. ECF No. 20-10 at PageID.901. Ruhlman and Zuzga discussed "our current B piling machines and the need to make them better either through working with a current supplier, which was preferable, or somehow coming up with a new way to better handle, store and unload beets." ECF No. 20-10 at PageID.903. Ruhlman testified, "We had pilers that had some very – some base features that were very solid. We had some pilers that were – that had a reputable name. I, at the time, was not interested in building a piler from scratch, and so I was more interested in adding on components to existing vendors than to create our own." ECF No. 20-10 at PageID.915. Zuzga was told "to look at options for better cleaning, handling, and unloading features." ECF No. 20-10 at PageID.913-915. Historically, Michigan Sugar "had [ ] not made equipment to be patented." ECF No. 20-10 at PageID.915-916.

**i.**

Zuzga researched the current systems and was frustrated that he could not find something that met Michigan Sugar's needs. He then began drawing an entirely new dirt remover and piler. He testified that he created the idea "[b]ecause I was in the process of trying to find a solution for Michigan Sugar and coming to many, many dead-ends. Nobody had a solution. Nobody had an off the shelf way to help them. And I came up with a configuration and idea and thought that I would try to help." ECF No. 20-2 at PageID.515. First, Zuzga worked with Ropa Maus to significantly alter their self-propelled harvesters to pick up beets and weigh them. ECF No. 20-2 at PageID.472-480. In March of 2016, Zuzga emailed Ropa, explaining that he was "in charge of research and implementation for Michigan Sugar agriculture beet receiving and storage." ECF No. 20-2 at PageID.479-480. He went on to state, "I would like to work with your engineers to slightly alter your existing machines to better fit our needs. This will create a proprietary product that I would like to discuss Michigan Sugar's role in this opportunity." *Id.* It was later determined that the amended Ropa system would not work for Michigan Sugar. ECF No. 20-2 at PageID.481.

**ii.**

Zuzga then reconfigured current Michigan Sugar equipment to change the flow of trucks through the plant and reconfigured the conventional conveyor belts and rollers. ECF No. 20-2 at PageID.481-490. Zuzga testified that when he brought the piler drawings to Ruhlman initially, he was told "to be focused on my job duties, which were maintenance management and organizing the maintenance department and putting in that structure. He didn't want me focused on equipment design, that's not what they're there to do, that's not my job." ECF No. 20-3 at PageID.859-860.

Ruhlman testified that his preference was for Zuzga to research and find better equipment from a current supplier. ECF No. 20-10 at PageID.914-915. He also does not recall telling Zuzga

to sketch designs for a new piler. ECF No. 20-10 at PageID.914-915. Ruhlman also testified that "at the time, [I] was not interested in building a piler from scratch, and so I was more interested in adding on components to existing vendors than to create our own." ECF No. 20-10 at PageID.914-915. He remembers telling Zuzga that "we're not in the business of making machinery for patent reasons, but I did not – I don't recall ever telling him it's not your job to invent." ECF No. 20-10 at PageID.903-904.

Ruhlman did testify that Zuzga's job as the maintenance manager "was to oversee the design and engineering of capital projects, and a piler is a capital project." ECF No. 20-10 at PageID.903-904. In addition, Ruhlman emphasized that the statement regarding patents was made in relationship to Zuzga working on the RFID antenna readers, not the beet piler. ECF No. 20-10 at PageID.903-904.

### iii.

Zuzga worked with the engineering firm Kringstad to take his drawings and turn them into computer designs. ECF No. 20-2 at PageID.552; ECF No. 20-12. Michigan Sugar paid Kringstad about $22,000 for their computer-generated versions of Zuzga's hand drawn illustrations. ECF No. 20-2 at PageID.552; ECF No. 20-13. Zuzga did not pay Kringstad. ECF No. 20-2 at PageID.560-561. There was a proposed license agreement between Kringstad and Michigan Sugar, but the agreement was not finalized because the business relationship deteriorated soon after. However, a copy of the typed agreement with the title "Patent Licensing Outline of Terms" outlined a royalty that would have been paid to Michigan Sugar and stated that Kringstad would assign any potential rights to patents, copyrights, trade secrets to Michigan Sugar. ECF No. 20-16 at PageID.1071. The document was prepared by Michigan Sugar's patent attorney in early to mid-February 2018 at Zuzga's request. ECF No. 20-2 at PageID.544-548. Due to disagreements, Zuzga ended the

relationship between Kringstad and Michigan Sugar in February 2018. ECF No. 20-2 at PageID.553.

Zuzga, on behalf of Michigan Sugar, hired engineering firm Krech Ojard to finish the work on the piler. ECF No. 20-2 at PageID.552-553. In late February 2018, Zuzga forwarded Krech a non-disclosure agreement that was prepared by Michigan Sugar's patent attorney regarding the piler. ECF No. 20-2 at PageID.556-557; ECF No. 20-19 at PageID.1129-1130; ECF No. 20-20; ECF No. 20-21. The NDA included an assignment of rights clause from Krech to Michigan Sugar. ECF No. 20-20; ECF No. 20-21. Additionally, it stated, "Any and all works of authorship by the Supplier, which in the sole determination of Michigan Sugar relate to information (whether confidential or not) disclosed by Michigan Sugar to the Supplier shall be considered as 'works for hire' owned by Michigan Sugar." ECF No. 20-19 at PageID.1131; ECF No. 20-20 at PageID.1216.

Zuzga testified that Krech "worked out the details of how that dump hopper could come to life. [Krech] filled out horsepower, strength of the equipment."  ECF No. 20-2 at PageID.566. However, Zuzga maintained that "[t]he configuration, design, and the functionality of the machine was all [his] concept" and that "[Krech] just helped make it possible for coming up with the detailed . . . weight restrictions, the structural integrity of the machine, the flow of the machine. They were there to help connect the dots on the very technical side of it." *Id.*  Krech's representative testified that "[T]he drawings and animations [made by Krech] were derived from the concepts [ ] presented to us at the scoping portion of the project." ECF No. 20-19 at PageID.1185. Sometime in March 2018, Krech understood they would be creating documents for a potential patent application. ECF No. 20-19 at PageID.1136-1138. Krech reached the purchase order limit from Michigan Sugar in January 2019 and have not done any additional work. ECF No. 20-19 at PageID.1193.

**E.**

Michigan Sugar first pursued the idea of the patent because of discussions with Kriegstad where Michigan Sugar learned that they have paid licensing fees when they purchased pilers in the past. ECF No. 20-10 at PageID.944-945. "Most of the work" on the piler occurred during Zuzga's employment, even though Zuzga created the initial design himself. ECF No. 20-3 at PageID.781-782. Until the disagreement over the assignment, Zuzga thought he and Michigan Sugar were working collaboratively on the patent and new design. ECF No. 20-3 at PageID.780-781.

Sometime in September 2018, Zuzga began looking for his own patent attorney. ECF No. 20-3 at PageID.858. Also, at the end of August and beginning of September 2018, Michigan Sugar, through its own patent attorney, asked Zuzga to sign over the assignment of the patent to Michigan Sugar. ECF No. 20-3 at PageID.774; ECF No. 20-25 at PageID.1396-1397. Specifically, the email from patent attorney Monte Falcoff stated,

> The company already owns your rights to the invention as a matter of 'common law', however, this signed formal Assignment document is required to record such in the U.S. Patent Office. Much like recording the purchase of a car with the Sec. of State. The Assignment is a very standard document used in all situations where an inventor invents as part of his employment.

ECF No. 20-25 at PageID.1396-1397.

Mr. Ruhlman followed up with emails on September 20 and 26, 2018 asking Zuzga to sign the assignment. ECF No. 20-27. On September 26, 2018 Zuzga sent an email indicating that he would assign his rights to Michigan Sugar. ECF No. 20-10 at PageID.949-950; ECF No. 20-27 at PageID.1535.

On November 23, 2018, however, Zuzga placed a letter on Ruhlman's desk explaining that he would not assign his rights to the piler to Michigan Sugar. ECF No. 20-3 at PageID.634-635;

ECF No. 20-10 at PageID.974-975. The letter explained why he previously stated in September

that he would assign his rights,

> I needed time to work through this decision and I felt my family's financial
> wellbeing was being threatened. Not by you personally, by your obligations to
> represent MSC. I felt that the only safe way to deal with this was to say I would
> sign it then before actually signing the document I would research my legal options.
> I'm sorry for misleading you but I had to look out of my family's wellbeing.

ECF No. 20-29 at PageID.1578. It also states,

> If MSC chooses to move forward with the project I am prepared to repay the patent
> attorney fees up to this point. If MSC decides to cancel the project I will be
> continuing forward independently. I am prepared to discuss with the company
> potential reimbursement for any appropriate expenses MSC feels should have been
> my obligation during this project. I bear all responsibility for the outcome of my
> decision and respect any decision you will have to make based on your obligation
> to the Co-op. I sincerely apologize for the tough spot I have put you in.

ECF No. 20-3 at PageID.777-778.

Zuzga testified that he and Michigan Sugar's patent attorney (Monte Falcoff) discussed the

fact that Zuzga would likely be fired if he did not sign the assignment. ECF No. 20-3 at

PageID.619. Specifically, Zuzga testified,

> You [Mr. Falcoff] made comments similar to that throughout the conversation. It
> was lengthy. And I actually stopped you at one point and asked if you were trying
> to tell me that I was going to be fired for this. And you said no, not necessarily, I
> haven't made my recommendation yet, but maybe following my recommendation
> you might be.

ECF No. 20-3 at PageID.619.

Zuzga also spoke with Ruhlman and believed that not signing the assignment was "a bad

decision for [his] career" and he "wasn't going to be allowed to be promoted," but at that time he

did not think he would be fired. ECF No. 20-3 at PageID.771-773. Zuzga never signed the

assignment of the patent. ECF No. 20-3 at PageID.618-619.

**i.**

Ruhlman testified he remembers a meeting with Zuzga's mentor Probate Judge Clabuesch around May 2017 where they discussed "the benefits of a patent" as well as some compensation for Zuzga for his contribution to the new piler. ECF No. 20-10 at PageID.918-919. Zuzga testified at his deposition that he previously told Ruhlman he wanted a royalty for his invention, but nothing was placed in writing. ECF No. 20-2 at PageID.544.

In a February 2018 slideshow presentation created by Kringstad and modified by Zuzga for the Grow Relation Board, Zuzga included a slide that stated, "Every machine sold anywhere is money back to the co-op." ECF No. 20-13 at PageID.1063; 20-2 at PageID.537-538, 540-543. During his deposition, Zuzga was asked what he meant by that statement and he testified that his "goal [was] to work with Michigan Sugar to develop a co-licensing opportunity for myself and them where the co-op would get a portion of the royalty as well as I would." ECF No. 20-2 at PageID.544.

Additionally, in January 2019, Zuzga and his attorney developed a written proposal for shop rights for Mark Flegenheimer, CEO and President of Michigan Sugar. ECF No. 20-3 at PageID.773; ECF No. 20-3 at PageID.779; ECF No. 20-3 at PageID.783-784. Also in January, Zuzga asked his attorney to file a report of an alleged illegal filing of a patent application. ECF No. 20-3 at PageID.686. Finally, in January, Zuzga informed Ruhlman that he filed a report with the US Patent Office about Michigan Sugar falsely claiming that Zuzga had assigned his rights to the piler. ECF No. 20-3 at PageID.773-774; ECF No. 20-26 at PageID.1726.

**F.**

On February 14, 2018, Michigan Sugar filed a provisional patent application for the beet piler. ECF No. 20-17. Michigan Sugar filed a utility patent application on November 27, 2018.

ECF No. 20-30; ECF No. 20-26 at PageID.1455-1456. On January 28, 2019, Zuzga's patent attorney, James Mitchell, filed a utility patent application that was nearly identical to Michigan Sugar's utility patent application with a few changes in the beginning and end pages. ECF No. 20-2 at PageID.613-614; ECF No. 20-3 at PageID.651; ECF No. 20-37.

Zuzga testified that he does not remember sending copies of Michigan Sugar's provisional or utility patent applications to anyone other than his attorneys. ECF No. 20-3 at PageID.631. Zuzga also explained that he was not involved in the details of his attorney's work. He explained that he asked a patent attorney for assistance and the patent attorney acted accordingly. ECF No. 20-3 at PageID.637-638.

### G.

### i.

At the end of 2018, Zuzga asked his attorney to create a nondisclosure agreement for Zuzga to give to three fellow employees. Zuzga testified that he "would always discuss [his] different ideas. I brained stormed a lot of ideas myself. And I just wanted them to keep the things that I discussed with them private between me and them." ECF No. 20-3 at PageID.621-623. Zuzga asked Craig Maurer, who reported directly to him, Greg Eremia, and Paul Bach to sign the agreement. ECF No. 20-3 at PageID.620-623. The NDA was given to Eremia and Bach on Michigan Sugar property during work hours. ECF No. 20-3 at PageID.627. Maurer signed the agreement on December 10, 2018 and Eremia signed the agreement on January 4, 2019. ECF Nos. 20-3 at PageID.620-623.

Maurer testified that he signed the agreement voluntarily and that Zuzga did not threaten him. ECF No. 20-32 at PageID.1664. He believed that he could still work on the piler after signing the NDA. ECF No. 20-32 at PageID.1670. Eremia said he was not threatened to sign the NDA,

but he believed the NDA applied to the piler project. ECF No. 20-33 at PageID.1697. However, he testified that signing the NDA did not hinder his job duties and he was also not told that he could not work on the piler. ECF No. 20-33 at PageID.1701. Zuzga was adamant that he "absolutely [did] not" imply that Maurer, Bach, and Eremia had to sign the NDA or face employment consequences. ECF No. 20-3 at PageID.658-659.

All three individuals asked Zuzga if they could still work on Zuzga's piler concept after they signed the NDA. Zuzga testified, "I said under any circumstance you continue working that piler. [Michigan Sugar] ha[s] shop rights to it. They will do whatever they have to do and you do not not work on their piler." ECF No. 20-3 at PageID.623-625.

The purpose of the NDA according to Zuzga was not to prevent the three individuals from working on the piler, but "about other things[ ] [b]ecause I talked to these gentlemen about a lot of different things that go through my mind, just bouncing ideas off them for feedback." ECF No. 20-3 at PageID.623-625. Due to a misunderstanding between Zuzga and his patent attorney, the NDA could be read to prevent the Maurer, Bach, and Eremia from working on the piler. ECF No. 20-3 at PageID.624-627. For example, the NDA included the statement "John Zuzga, has conceived and/or developed concepts for equipment useful in dirt removal and piling in products such as beets (the Zuzga Concepts)." ECF No. 20-3 at PageID.624-625; ECF No. 20-34 at PageID.1722.

## ii.

During Zuzga's exit interview, he signed a statement that he acknowledged that any company property he had at home must be returned. ECF No. 20-3 at PageID.641-642. However, he testified that he explained to HR at the time that he did not know if he had any company property at home and the HR representative told him to return whatever he found. ECF No. 20-3 at

PageID.641-642. At some point, Zuzga returned a flash drive and other belongings to Michigan

Sugar. ECF No. 20-3 at PageID.642-643. At a later date, Zuzga returned some additional materials

that he found in a backpack in his house. ECF No. 20-3 at PageID.649-650.

### iii.

Zuzga's employment was terminated by Ruhlman. ECF No. 20-10 at PageID.987-988.

Ruhlman testified that Zuzga was terminated for "failure to sign over the assignment rights," "the

fiduciary breach with the employees [regarding the NDA]," and his "performance at the end" of

his employment. ECF No. 20-10 at PageID.991. Ruhlman testified that "the very fact that [the

NDA] was signed or asked to be signed was in direct conflict with the fiduciary duty of John in

order to ensure the integrity and the cohesiveness of our employee." ECF No. 20-10 at PageID.996-

997. Part of the termination letter, signed by Ruhlman, states "As we discussed, the employment

relationship has become increasingly difficult given your refusal to acknowledge the Declaration

and appropriate Assignment of Michigan Sugar Company's rights in regard to the Dirt Removal

and Piling Machine." ECF No. 20-26 at PageID.1506-1507; ECF No. 20-38 at PageID.1871.

### II.

A motion for summary judgment should be granted if the "movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the

record for evidence "which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party

who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all

reasonable inferences in favor of the non-movant and determine "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law." *Id.* at 251–52.

### III.

Defendants filed a motion for summary judgment seeking dismissal of Plaintiff's five

counts and asking the Court to grant its counter-claims for Michigan Trade Secret

Misappropriation, breach of fiduciary duty, and declaratory judgment. ECF No. 20. Plaintiff's

cross-motion for summary judgment seeks dismissal of Defendants' five counter-claims and asks

the Court to grant his claims for conversion, business defamation, and declaratory judgment.

### IV.

Because the decision on the claim seeking a declaratory judgment claim impacts the

remainder of the parties' claims, the parties' requests for declaratory judgment will be addressed

first.

### i.

28 U.S.C. § 2201 provides

In a case of actual controversy within its jurisdiction . . . any court of the United
States, upon the filing of an appropriate pleading, may declare the rights and
other legal relations of any interested party seeking such declaration, whether or
not further relief is or could be sought. Any such declaration shall have the force
and effect of a final judgment or decree and shall be reviewable as such.

The Sixth Circuit has explained there are two principles to be considered "in determining whether

a declaratory ruling is appropriate." *Grand Truck W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323,

326 (6th Cir. 1984). First is whether "the judgment will serve a useful purpose in clarifying and

settling the legal relations in issue" and second is if the declaratory judgment "will terminate and

afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Id.*

These two principles should be applied by analyzing five factors

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race for res judicata;' (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective."

*Id.* In this case, a determination of whether Plaintiff or Defendants have a right to the patent would provide the necessary legal conclusion to address the remaining claims, meeting the first two factors. As such, the declaratory judgment is not being sought solely for procedural maneuvering, which is the third factor. Finally, analyzing the fourth and fifth factors, there is no state court action involved, and there is no alternate remedy that would be more effective at resolving the case.

### ii.

The United States Constitution provides that Congress has authority "[t]o promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." Article I, § 8, clause 8. "A patent is property, and title to it can pass only by assignment." *U.S. v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 (1933). "[A]n invention presumptively belongs to its creator." *Teets v. Chromalloy Gas Turbine Corp.*, 83 F.3d 403, 407 (Fed. Cir. 1996). This presumption also applies in the employee/employer context. *Id.* ("Consistent with the presumption that the inventor owns his invention, an individual owns the patent rights even though the invention was conceived and/or reduced to practice during the course of employment."). For example,

> [A] manufacturing corporation which has employed a skilled workman, for a stated compensation, to take charge of its works, and to devote his time and services to devising and making improvements in articles there manufactured, is not entitled to a conveyance of patents obtained for inventions made by him while so employed, in the absence of express agreement to that effect.

*Dalzell v. Deuber Watch-Case Manufacturing Co.*, 149 U.S. 315, 320 (1893). To recognize the employers' interest in its employees on the job inventions, "an employer may obtain a shop right in employee inventions where it has contributed to the development of the invention. A shop right permits the employer to use the employee's invention without liability for infringement." *Teets*, 83 F.3d at 407; *McElmurry v. Arkansas Power & Light Co.,* 995 F.2d 1576, 1582 (Fed. Cir. 1993).

> A shop right is an employer's royalty or fee, a nonexclusive and nontransferable license to use an employee's patented invention. In determining whether a shop right exists, the parties' relationship is examined. An employer will have shop rights in an invention in situations where the employer has financed an employee's invention by providing wages, materials, tools and a work place. Other factors in considering the creation of shop rights include an employee's consent, acquiescence, inducement, or assistance to the employer in using the invention without demanding compensation or other notice of restriction.

*Witherspoon v. Moneyhun Equip. Sales & Serv. Co.*, 2013 WL 1870564, at *7 (D. Utah May 3, 2013) (footnotes and internal quotations omitted).

There are two exceptions to the general rule protecting an inventor's right to patent his or her inventions. First, an employee may choose to contractually "assign all rights in inventive ideas to the employer." *Teets*, 83 F.3d at 407; *U.S. v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 (1933). ("If not yet issued, an agreement to assignment when issued, if valid as a contract, will be specifically enforced."). Second, even without a contract, "employers may still claim an employee's inventive work where the employer specifically hires or directs the employee to exercise inventive faculties." *Teets*, 83 F.3d at 407. "One employed to make an invention, who succeeds, during his term of service, in accomplishing that task, is bound to assign to his employer any patent obtained." *U.S. v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 (1933). This is because "he has only produced that which he was employed to invent. His invention is the precise subject of the contract of employment. A term of the agreement necessarily is that what he is paid to produce belongs to his paymaster." *Id.*

"[A] court must examine the employment relationship at the time of the inventive work to determine if the parties entered an implied-in-fact contract to assign patient rights." *Teets*, 83 F.3d at 407. "An implied-in-fact contract is an agreement 'founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *Teets*, 83 F.3d at 407 (quoting *Baltimore & O. R. R. Co. v. United States*, 261 U.S. 592, 597 (1923)). However, simply because an individual is an employee, it does not mean the employer owns the right to the assignment. "On the other hand, if the employment be general, albeit it covers a field of labor and effort in the performance of which the employee conceived the invention or which he obtained a patent, the contract is not so broadly construed as to require an assignment of the patent." *U.S. v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 (1933).

"As a matter of common law, after the Supreme Court's decision in *Erie Railroad v. Tompkins*, state contract principles provide the rules for identifying and enforcing implied-in-fact contracts." *Teets*, 83 F.3d at 407 (full citation omitted). However, the Federal Circuit concluded that Florida, among other states, follow pre-*Erie* Supreme Court precedent for cases regarding inventive rights. *Id.* The Michigan Supreme Court has adopted the *Teets* test for implied in fact contracts regarding innovative rights. *See Banks v. Unisys Corp.*, 228 F.3d 1357, 1358 n. 1 (Fed. Cir. 2000) (noting Judge Cohn's discussion of Michigan's employed to invent rule with approval).

Defendants argue that this case is factually similar to *Witherspoon v. Moneyhun Equipment Sales and Services Company*. ECF No. 20 at PageID.329-330. In *Witherspoon*, the employee invented a solution to a problem the employer was having, worked on the invention as part of his duties and during the paid workday, and the company paid for the development of the invention. *Witherspoon*, at *9–10. The employee's title was "Senior Process/Design Engineer." *Id.* at *9. The

Utah District Judge held, citing *Teets*, "Even if hired for a general purpose, an employee with the specific task of developing a device or process may cede ownership of the invention from that task to the employer." *Id.* at *10–11.

There was no express agreement between Zuzga and Michigan Sugar regarding assignment of patents. Therefore, Michigan Sugar's only means to obtain the right to the assignment is through an implied in fact contract. Michigan Sugar has even admitted as such. Mr. Falcoff stated in his email to Plaintiff that Michigan Sugar owned the rights to the patent through an implied in fact agreement. ECF No. 20-25 at PageID.1396–97 ("The company already owns your rights to the invention as a matter of 'common law', however, this signed formal Assignment document is required to record such in the U.S. Patent Office.").

Here, there are significant facts which point to a potential agreement between Zuzga and his employer, indicating an implied in fact agreement. *Teets*, 83 F.3d at 407. Zuzga was responsible for all agricultural department equipment at the time he designed the piler. ECF No. 20-2 at PageID.403. He also testified that "[he] was responsible for identifying capital opportunities, [ ] implementing and developing processes and new process changes" and that part of his job included improving the beat pilers. ECF No. 20-2 at PageID.401-02. Further, one of the responsibilities spelled out in the job description for the agricultural maintenance manager, is "[o]versee the design and engineering for new capital projects. This includes collaboration with engineering firms and contractors." ECF No. Part 20-9 at PageID.883. Additionally, Michigan Sugar paid Kringstad and Krech engineering firms for their computer-generated drawings of Zuzga's initial hand-drawn illustrations. ECF No. 20-2 at PageID.552; ECF No. 20-13; ECF No. 20-19 at PageID.1193. Moreover, Zuzga worked with the engineering firms to protect any rights Michigan Sugar had to the piler by sharing proposed license agreements and non-disclosure agreements that Michigan

Sugar's patent attorney drew up. ECF No. 20-16 at PageID.1071; ECF No. 20-2 at PageID.544-548, 556-557; ECF No. 20-19 at PageID.1129-1130; ECF No. 20-20; ECF No. 20-21. Finally, while Zuzga may have completed the initial design of the piler on his own time, he developed the piler concept with Michigan Sugar's resources and on company time.

On the other hand, there are facts that point in the opposite direction and demonstrate that Zuzga was not directed to invent a new piler and therefore, the invention should follow the traditional presumption that the inventor owns the patent. *See Teets*, 83 F.3d at 407. Zuzga testified that most of the equipment improvements he made during his tenure were manufacturer recommendations and adjusting equipment to work as intended. ECF No. 20-3 at PageID.745-750. The exception is the RFID antenna development when Ruhlman informed Zuzga that Michigan Sugar was "not in the business of equipment design" and approved Zuzga's request to file a provisional patent. ECF No. 20-2 at PageID.464-465; ECF No. 20-10 at PageID.903-906. Specifically, on the piler project, Ruhlman testified that he had no interest in inventing a new piler and "was more interested in adding on components to existing vendors." ECF No. 20-10 at PageID.915. Zuzga testified that when he brought his original drawings to Ruhlman, he was told to focus on his job duties instead of equipment design. ECF No. 20-3 at PageID.859-860. Finally, Michigan Sugar did not pursue a patent until after discussions with Kriegstad—after Zuzga had completed his first sketches of the piler. ECF No. 20-10 at PageID.944-945.

Neither party has met the burden of demonstrating that there is no genuine issue of material fact regarding either Plaintiff or Michigan Sugar's ownership of the piler. As outlined above, there are facts that support both parties' assertions. When there is a genuine issue of material fact that requires the evaluation of competing factual information and a determination of the truthfulness

and accuracy of witness testimony, those questions must be resolved by a jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.242, 248–51 (1986).

Defendants' motion for summary judgment on declaratory relief and Plaintiff's cross-motion for the same will be denied. As aptly summarized by Defendants' in their motion for summary judgment, "This lawsuit centers around one overarching issue: who owns the patent applications pertaining to a sugar beet Dirt Removal and Piling Machine." ECF No. 20 at PageID.317. Because the question of declaratory judgment will not be resolved at this stage in the litigation, the remainder of Defendants' and Plaintiff's claims and counterclaims cannot be decided. Therefore, both Plaintiff's and Defendants' motions for summary judgment will be denied in their entirety.[1]

## V.

Accordingly, it is **ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 20, is **DENIED**.

It is further **ORDERED** that Plaintiff's Motion for Summary Judgment, ECF No. 21, is **DENIED**.

Dated: August 27, 2020                                s/Thomas L. Ludington
                                                      THOMAS L. LUDINGTON
                                                      United States District Judge

---

[1] It should be noted that Plaintiff voluntarily dismissed his tortious interference claim. ECF No. 24 at PageID.2455.